IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MICHAEL GLEAN,                                    :
                                                  :
                              Plaintiff           :
                                                  :
          VS.                                     :
                                                  :     NO. 5:02-CV-386 (WDO)
UNIVERSITY OF GEORGIA, *et al*.,                  :
                                                  :
                             Defendants           :     PROCEEDINGS UNDER 42 U.S.C. § 1983
                                                  :     BEFORE THE U. S. MAGISTRATE JUDGE

# RECOMMENDATION

Plaintiff MICHAEL GLEAN is an inmate in the custody of the State of Georgia.  He has sued

defendants UNIVERSITY OF GEORGIA,[1] JIM WETHERINGTON, DR. OMITOWOJU, JAMES TAYLOR, DR.

KALU-KALU, JOSEPH FOWLKES, LAURENCE HARRIS, and L. DENBY[2] alleging that the defendants

violated his constitutional rights while he was incarcerated at Bostick State Prison in Hardwick,

Georgia. Plaintiff claims he was not properly treated following his total hip replacement surgery.

He alleges that the surgery left one leg shorter than the other and that he did not receive necessary

physical therapy.  Plaintiff also claims that he did not receive proper medical treatment for various

other medical conditions.

Before the court is the defendants' **MOTION FOR SUMMARY JUDGMENT**.  Tab #94.

The motion is supported by a brief, affidavit, deposition, and medical records. The court advised the

plaintiff of said motion and his duty to respond properly thereto. Tab #97.  The plaintiff has filed a

response to the defendants' motion. Tabs #100-102. In entering this recommendation, the

undersigned has carefully considered the defendants' motion and all attachments thereto, as well as

the plaintiff's responses.

---

[1]The defendants' Motion For Summary Judgment does not state that it was filed on behalf of the University of Georgia.  However, the undersigned has spoken with defense counsel who stated that this was merely an oversight on their part and the motion was also filed on behalf of the University.

[2]In his original complaint, plaintiff sued the Georgia Department of Correction, John Doe Hospital Authority, S. Mandel, ER Nurses Jane Does 1-4, Lucha McNair, Karen Litterman, Bostick Pharmacists, Bostick Prison Nurses, and Oconee Regional Medical Center.  All of these individuals have been terminated as defendants in the present suit.

LEGAL STANDARDS
**A. Summary Judgment**

Rule 56 of the *Federal Rules of Civil Procedure* dealing with motions for summary judgment provides as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Summary judgment can only be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir. 1984).

Specifically, the party seeking summary judgment bears the initial burden to demonstrate to the court the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show that there is an absence of any genuine issue of material fact. *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1998). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn from this, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

If the moving party successfully meets this burden, the burden then shifts to the non-moving party to establish by going beyond the pleadings, that there are genuine issues of material fact to be resolved by a fact-finder. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Genuine issues are those as to which the evidence is such that a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).[3]

## DISCUSSION
### 1. Deliberate Indifference

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, rehearing denied 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1976). However, the course of treatment is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.[4] A mere disagreement between a prisoner and prison officials as to diagnosis or treatment does not give rise to a constitutional violation. *Id.* at 106.

Delay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain. Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to lay persons because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not violate the Eighth Amendment. The seriousness of an inmate's medical needs may be decided by reference to the effect of the delay in treatment.

---

[3] *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (the purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial); *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 (11th Cir. 1988) (the question is whether the record as a whole could lead a rational trier of fact to find for the nonmovant).

[4] At most, a mere allegation of improper or untimely treatment, without more, states a claim of medical malpractice cognizable under state law. *Id. See also Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) (vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), reinstated by unpublished order (June 24, 1991), cited in *Howell v. Burden*, 12 F.3d 190, 191 n.* (11th Cir. 1994)). Moreover, *Estelle* specifically states that the question of whether an x-ray or additional diagnostic techniques or forms of treatment are indicated are classic examples of matters for medical judgment and that medical malpractice does not become a constitutional violation merely because the patient is a prisoner. 97 S.Ct. at 292-93.

Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place <u>verifying</u> <u>medical</u> <u>evidence</u> <u>in</u> <u>the</u> <u>record</u> to establish the detrimental effect of delay in medical treatment to succeed. Further, the tolerable length of the delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay. *Hill v. Dekalb R.Y.D.C.*, 40 F.3d 1176, (11th Cir.1994) (emphasis added).

In support of their motion for summary judgment, the defendants have submitted portions of the plaintiff's medical records, and the affidavit of Dr. Gairy Hall. The medical records and affidavit indicate that the defendants were not deliberately indifferent to plaintiff's serious medical needs.

On October 10, 2000, defendant Omitowoju performed a chest exam and x-ray on plaintiff. Results showed that his lungs were hyperinflated, his cardiac silhouette was mildly enlarged, his aorta was slightly tortuous, and that there were degenerative changes to the thoracic spine. A total hip replacement was also recommended due to degenerative arthritis of the left hip. It was noted that plaintiff had been prescribed Motrin, Levothroid, Cardizem, and a diuretic. Defendant Omitowoju also ordered various tests and three units of packed red blood cells in preparation for plaintiff's hip replacement.   Tab #95, Medical Records at 1-3.

Plaintiff underwent a total left hip replacement on October 18, 2000. Defendant Oitowoju's report stated that he tolerated the procedure well. However, Dr. Puri's consult report stated that plaintiff had significant bleeding during the surgery and required a significant amount of blood. Dr. Puri felt plaintiff was suffering from postoperative respiratory insufficiency and recommended that he be moved to the ICU so as to be put on a ventilator. *Id.* at 4-6.

4

While recovering from surgery, plaintiff was seen by a physical therapist from October 19 through 22, 2000.  The therapist evaluated plaintiff's condition and instructed him on therapeutic exercises that he should continue following his discharge.  It was noted that plaintiff would have difficulty maintaining his therapy after returning to prison.  *Id*. at 7-11.

Plaintiff was discharged from Oconee Regional Hospital on October 23, 2000, in satisfactory condition.  Post-operative x-rays of his left hip showed no evidence of dislocation or sublaxation.  He was then transferred to Baldwin State Prison (Baldwin) and placed in the infirmary.  He was prescribed Ancef, Tylenol #3, Motrin, Nubain, Cardura, Norvase, Synthroid, Colace, and ECASA. *Id*. at 12-14.

Plaintiff remained at Baldwin until November 28, 2000.  His discharge summary stated that his surgical scar was clean and dry and that he was able to ambulate with crutches.  While at Baldwin, plaintiff was also treated for anemia with ferrous sulfate and for a cough. In addition to the medications he was prescribed while still in the hospital, plaintiff was also prescribed Metamucil for constipation, Percogesic for pain, mineral oil for dry skin, and a multi-vitamin.  Plaintiff's discharge instructions stated that he should continue taking his medications, walk with crutches, have a bottom bunk, and not bear any weight on his left leg.  *Id*. at 15-29.

A Quest Diagnostics lab report dated December 6, 2000, showed plaintiff's prostate specific antigen level was within normal range.  *Id*. at 29.

On December 8, 2000, a medical non-adherence counseling form was filled out for plaintiff. At that time his medications were noted to be ECASA, Ferrous Sulfate, multi-vitamin, Cardura, Percogesic, Levothroid, and Colace.  *Id.* at 31-32.

A nursing assessment was done on plaintiff on December 12, 2000, after he complained of pain and swelling in his left leg.  After examining plaintiff, defendant Fowlkes recommended that he have a Doppler Venous Study.  The study was done that same day.  There was no evidence deep vein thrombosis.  *Id*. at 33-36.

5

On December 23, 2000, a Quest Diagnostics lab report showed plaintiff's blood levels to be within the normal range. This indicated that he was no longer suffering from anemia. *Id*. at 37.

On January 17, 2001, plaintiff was seen by a nurse for complaints swelling, pain, and redness in his left leg. He was prescribed Motrin and an analgesic cream. He was also seen in the medical clinic the next day for the same complaints. However, when plaintiff was seen at the orthopaedic clinic on January 22, 2001, he was noted to be doing well. *Id*. at 42-45.

On March 8, 2001, a consultation request for plaintiff to be seen at the Orthopaedic clinic was submitted. *Id*. at 46.

A general medical form dated March 13, 2001, showed that plaintiff's blood pressure, hypertension, and cholesterol had been evaluated by defendant Fowlkes. He was prescribed Lipitor and advised of his medical condition. *Id*. at 47.

On April 16, 2001, a radiology report of plaintiff's left hip showed that there was no evidence of fracture or dislocation. However, a consultation report recommended that plaintiff have a CT scan of his left hip. The request was approved three days later and the results showed a migration of the acetabular component of the hip prothesis. *Id*. at 50-56.

A Quest Diagnostics lab report dated May 23, 2001, showed that plaintiff had a slightly elevated prostate specific antigen level. *Id*. at 60.

On May 30, 2001, defendant Kalu-Kalu discussed plaintiff's CT findings with him. It was explained to plaintiff that he would be referred to the orthopaedic clinic for a follow-up. A consultation request was submitted the next day. It was approved June 5, 2001. *Id*. at 61-62.

On June 4, 2001, plaintiff's health activity profile noted that he was medically unassigned and used crutches and a wheelchair. *Id*. at 66.

A Quest Diagnostics lab report dated June 9, 2001, showed plaintiff's thyroid hormone and prostate specific antigen levels to be elevated. *Id*. at 67.

Plaintiff had a follow-up appointment with defendant Omitowoju on July 9, 2001.  He did not agree with the comments in the CT report and recommended warm spring crutches for ambulation.  The crutches were ordered two days later and issued August 29, 2001.  *Id*. at 69-70, 75.

Plaintiff was fitted for an orthopaedic shoe on August 7, 2001.  *Id*. at 74.

A Quest Diagnostics lab report dated September 6, 2001, showed that plaintiff had elevated cholesterol levels.  *Id*. at 80.

A report dated September 7, 2001, stated that plaintiff's pain had been decreased with the use of his left shoe lift.  The use of a wheelchair was continued and he was instructed to return to medical in eight weeks.  *Id*. at 81.

Plaintiff had a follow-up appointment in the orthopaedic clinic on September 12, 2001. Apparently, plaintiff wanted to discuss reconstructive surgery as his left leg was shorter than his right following his hip replacement.  *Id*. at 82.

Plaintiff was seen in medical five times between January 15, 2002, and January 29, 2003, to monitor his hypertension, hypothyroidism, and HCHL levels.  *Id*. 91.

On January 17, 2002, plaintiff's thyroid stimulating hormone and prostate specific antigen levels were noted to be elevated.  *Id*. at 92.

Plaintiff was seen by defendant Kalu-Kalu on January 30, 2002.  Plaintiff's elevated lab results were discussed with him.  It was recommended that the lab work be repeated and that plaintiff continue using a wheelchair.  *Id*. at 93.

Plaintiff refused medical treatment on January 31, 2002.  *Id*. at 94.

Plaintiff's thyroid stimulating hormone level was elevated on February 22 and April 9, 2002 .  *Id*. at 99, 104.

On April 25, 2002, plaintiff had a follow-up in medical during which defendant Kalu-Kalu assessed plaintiff's hypertension and cholesterol levels.  Additional test were ordered and it was specified that plaintiff's blood pressure be monitored over the following four weeks.  *Id*. at 105.

On May 7, 2002, plaintiff's lab results showed that his triglyceride and HDL cholesterol levels were elevated.  Plaintiff also underwent an electrocardiogram three days later.  The results were normal.  *Id*. at 106-107.

Plaintiff's health activity profile dated June 14, 2002, stated that he was prescribed a wheelchair, was medically unassigned, and had a soft shoe profile for the next twelve months.  *Id*. at 108.

On July 18, 2002, plaintiff's lab work again showed that his HDL cholesterol and prostate specific antigen levels were elevated.  *Id*. at 109-110.

On July 31, 2002, plaintiff had an abnormal electrocardiogram.  However, no diagnosis was confirmed.  That same day, plaintiff complained of heart palpitations and a persistent cough.  An x-ray performed that day showed borderline cardiovascular changes.  *Id*. 111-113.

Lab results dated October 22, 2002, showed that plaintiff's thyroid stimulating hormone level was within normal range.  However, his HDL cholesterol was still elevated.  *Id*. at 116.

On October 23, 2002, plaintiff complained of joint pain after being taken off NSAIDs.  A week later he refused a visit with defendant Harris.  *Id.* at 117-118.

On January 29, 2003, plaintiff had a follow-up medical appointment.  He was prescribed Motrin 800mg for pain and advised to use it sparingly.  *Id*. at 123.

On April 22, 2003, plaintiff's HDL cholesterol level was still found to be elevated.  *Id*. at 127.

Plaintiff had a follow-up visit with defendant Harris on May 5, 2003.  Defendant Harris requested that plaintiff's orthopaedic shoe be repaired.  *Id*. at 128-130.

Plaintiff's thyroid stimulating hormone was noted to be elevated on May 13, 2003.  *Id*. at 131.

A June 19, 2003, health activity profile for plaintiff stated that he was medically unassigned, and had a profile for a bottom bunk and a wheelchair.  A soft shoe profile was also requested.  *Id*. at 134-138.

On August 13, 2003, plaintiff complained of a productive cough.  He was diagnosed with an upper respiratory infection and prescribed chlor-trimeton.  *Id*. at 140.

Plaintiff was seen in medical on August 29, 2003.  At that time he stated that he suffered from bronchiectasis.  He was given a chest x-ray and prescribed Amoxicillim and Robitussin.  A follow-up visit was scheduled for a week later and it was noted that he may need a CT scan and pulmonary function test to rule out other diagnoses.  *Id*. at 141.

On June 8, 2004, defendant Hall requested a consult for plaintiff to have a pulmonary function test to rule out chronic obstructive disease as the cause of his cough.  A follow-up appointment was scheduled for September 22, 2004.  *Id*. at 142-143.

Plaintiff underwent a pulmonary function test on September 22, 2004.  It was noted that plaintiff had been a smoker of cigarettes and marijuana in the past and that he had had a chronic cough for two and a half years.  Results suggested restrictive lung disease, mild reduction in diffusing lung capacity, and mild restrictive disease.  *Id*. at 144.

On October 5, 2004, Dr. Moore requested a consult for a pulmonary evaluation to rule out bronciectasis.  An appointment was set for December 17, 2004.  *Id*. at 145-146.

Plaintiff had a CT scan on January 19, 2005, to rule out congestive heart failure.  Results showed a small renal stone, senescent changes, and no acute pulmonary process.  *Id*. at 147.

Plaintiff had a echocardiogram on February 5, 2005.  Results showed mild left ventricle systolic function of 56% with no abnormal wall motion, Doppler evidence of diastolic function, and sclerotic aortic valve with trace aortic insufficiency.  *Id*. at 148.

In response to the defendants' motion, the plaintiff has submitted nothing of substance to adequately rebut the defendants showing that he was provided with constitutionally adequate medical care for his medical conditions.  Significantly, plaintiff has failed to submit any medical evidence to supports his contention that his treatment fell below applicable medical standards and constitutionally adequate standards of care.[5]  He simply disagrees with the defendants' treatment of his medical problems.

---

[5]In his response, plaintiff states that the defendants' have altered his medical records and that discovery should be extended for another six months so as he can examine the accurate copies of his medical records. However, plaintiff provides no evidence beyond his unsubstantiated claims to support his allegations that his records have been altered.  Therefore, plaintiff's request to reopen discovery is **DENIED**.

In the court's view, plaintiff GLEAN has failed to establish the defendants' deliberate indifference to his medical needs, serious or otherwise.  He has submitted no medical evidence to support his contention that the defendants were deliberately indifferent in treating his medical complaints. The record is replete with indications that  treatment has been afforded the plaintiff. Therefore, the defendant are entitled to summary judgment on this claim.

Accordingly, IT IS RECOMMENDED that the defendants' MOTION FOR SUMMARY JUDGMENT (Tab #97) be **GRANTED**.  Pursuant to 28 U.S.C. §636(b)(1) the parties may serve and file written objections to this RECOMMENDATION with the district judge to whom the case is assigned **WITHIN TEN (10) DAYS** after being served with a copy thereof.

SO RECOMMENDED, this 29th day of JULY, 2005.



CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE